EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

CERTIFIED COPY

ERIC M. ALBRITTON            )
                             )
v.                           )
                             )      C.A. NO. 6:08-CV-00089
CISCO SYSTEMS, INC.,         )
RICK FRENKEL, MALLUN YEN &   )
JOHN NOH                     )

*********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF
DAVID MALAND
NOVEMBER 3, 2008
VOLUME I

*********************************************************

     ORAL AND VIDEOTAPED DEPOSITION OF DAVID MALAND,

produced as a witness at the instance of the Defendant,

and duly sworn, was taken in the above-styled and

numbered cause on the 3rd day of November, 2008, from

9:25 a.m. to 3:15 p.m., before April R. Eichelberger,

CSR in and for the State of Texas, reported by machine

shorthand, at the United States District Court for the

Eastern District of Texas, 211 West Ferguson Street in

the City Tyler and the State of Texas, pursuant to the

Federal Rules of Civil Procedure and the provisions

stated on the record or attached hereto.




1    will announce, in regard to the scope of the authorized

2    testimony today.

3                  MR. WELLS:  And Robert Wells, also with

4    the United States attorney's office in the same role.

5                  THE VIDEOGRAPHER:  Will the court

6    reporter please swear in the witness.

7                  DAVID MALAND,

8    having been first duly sworn, testified as follows:

9                  EXAMINATION

10   BY MR. BABCOCK:

11       Q.    Would you state your name, sir?

12       A.    David J. Maland.

13       Q.    And, Mr. Maland, how are you employed?

14       A.    I am the United States District Clerk for the

15   Eastern District of Texas.

16       Q.    How long have you held that position?

17       A.    Sixteen years and three months.

18                  MR. GIBSON:  Mr. Babcock, before we go

19   any further, can we put our -- just our brief

20   housekeeping matters on the record?  First of all, we --

21   as you know, we have several depositions that are set

22   for today.  I have the witness fees that were tendered

23   to Mae Velvin, to Shelley Moore, and to Rhonda Lafitte.

24   They are all deputy clerks employed by the United States

25   District Clerk's Office and reside and work or work in



1    near the end of the day and they wouldn't record it

2    until the beginning of the next day?

3        Q.   (BY MR. BABCOCK)   Right.

4        A.   Entirely possible.

5        Q.   Okay.

6        A.   That's as much as I can say about it.  I'm not

7    qualified to go forth.

8        Q.   And you're way ahead of me, so -- Ms. Parker

9    is computer-literate, but I'm not.  Okay.

10       A.   I can tell you that the docket entry, now,

11   these -- this docket entry, which is really the docket

12   entry in question that was modified --



13       Q.   Right.

14       A.   -- that does show filing fee, 350, Receipt

15   Number 1292, there's no date connected with it other

16   than October the 16th.

17       Q.   And of course, that was changed from the 15th.

18       A.   And that was changed.  It was originally what

19   Ms. Thompson, Faye N. Thompson in the parenthetical,

20   those are her initials.

21       Q.   Okay.

22       A.   What she did was change -- when I first looked

23   at it on the computer screen on -- I believe it was

24   October the 17th.



25       Q.   Right.   Yeah.



1          Q.    And then Ms. Thompson modified it on -- two

2     days later on the 17th to reflect 10/16/2007?

3          A.    Yes.

4          Q.    Okay.  Fine.  And the other -- other than the

5     date filed, changing it from the 15th to the 16th, and

6     the modified language --

7          A.    That -- that gets put in automatically by the

8     computer.

9          Q.    Okay.  But my point was, the other language

10    before modified was the same on the 15th and the 16th,

11    correct?

12         A.    Yeah.



13         Q.    That was my point.

14         A.    Yeah.

15         Q.    Let me keep going through these e-mails that

16    you produced for us, which will be great.

17         A.    Very good.

18         Q.    Here's Exhibit 86.  Are these e-mails -- is

19    the government the same as some of these where you start

20    at the back and go to the front?

21         A.    Start at the back.  Yeah, chronologically it

22    started out with the --

23         Q.    So -- so the first e-mail here would be from

24    Shelley Moore to yourself on October 18th, 2007, at

25    9:23 a.m.?

Page 33

1   telephonically.

2        Q.   Okay.

3        A.   This is an e-mail conversation.

4        Q.   Right.  Okay.  "Dear Shelley, check the NEF

5   for the complaint in that case," you wrote back.  "I

6   believe it shows a date of 10/16.  That's the document

7   that really matters."  That's what you wrote back to

8   her?

9        A.   I did.

10       Q.   And then she writes back to you, "I saw that.

11  And that is why I was puzzled that the computer showed

12  the 15th.  She must have finished the entry just seconds

13  after midnight."

14       A.   Yes.

15       Q.   And that's what she wrote back?

16       A.   That's what she wrote.

17       Q.   And did your subsequent investigation show

18  that what happened here was that Ms. Mathis had started

19  uploading this lengthy complaint with exhibits prior to

20  midnight and finished it shortly after midnight?

21       A.   Yes, yes.

22       Q.   And that's what -- that's what you found

23  happened?

24       A.   Oh, yes, yeah.

25       Q.   Okay.  And that's why it got the date on the





1    15th because she had started the filing process on the

2    15th?

3         A.    Yeah.  Now, there's a document that I want

4    to --

5         Q.    First of all, is that right?

6         A.    It is right.

7         Q.    Okay.

8         A.    Absolutely.  A document that's germane to

9    this -- let's see if -- it wouldn't be in the e-mails.

10   It would be in the -- oh, it is in the e-mails right at

11   the end.

12        Q.    Okay.  Let me --

13        A.    This is a fairly important document.  It is

14   that one.

15        Q.    That one.

16        A.    Very good.

17        Q.    Okay.  Exhibit 94, and --

18        A.    This is something that we were -- wanted some

19   written confirmation from our administrative office.

20   They are located -- their help desk, their -- really the

21   programmers for this national electronic filing system,

22   they are in San Antonio, Texas.  They cover the entire

23   country.  And we look to them for information as to how

24   the software operates.

25        Q.    Right.



1    writing.

2        Q.   Okay.  All right.  And under the -- under the

3    hypothetical, under our case, if Ms. Mathis started

4    uploading the complaint at 11:30 on the 15th, even

5    though she didn't hit, as the help desk says, the

6    "submit" button until 12:01, the nationwide system is

7    going to create a filing date of October 15th, not

8    October 16th when she hits the button?

9                    MR. HOLMES:  Objection, form.

10       Q.   (BY MR. BABCOCK)  Is that right?

11       A.   That's a con -- what you mean by filing date

12   is -- it's a real term of art here.



13       Q.   Okay.  Let me put it --

14       A.   And there's more than one date contained on

15   the NEF, which is the document that really determines

16   filing date.

17       Q.   Yeah.  But the problem, anyway, is -- and do

18   you know who on the help desk was helping you on this?

19   Do you know the name of the person?

20       A.   David might.

21       Q.   Okay.  I'll ask David about it.  But the help

22   desk is telling you that the reason the 15th popped up

23   is because Ms. Mathis had started entering the

24   complaint, which is a lengthy complaint, before

25   midnight --



A.    Yes.

Q.    -- even though she didn't only hit the submit
button until shortly after midnight?

MR. HOLMES:  Objection, form.

A.    Right.

Q.    (BY MR. BABCOCK)  Okay.  That clears that up.

A.    We just wanted something from the people who
are involved and knew the most about how the software
operated to confirm our longstanding suspicion that it
dragged in the date when she started the process.

Q.    Right.

A.    And I -- well...

Q.    And you know, from having dealt with rules for
your entire career and -- you probably don't know this,
but I'm the chair of the Supreme Court advisory
committee --

A.    Are you?

Q.    -- so I've dealt with rules -- not as long as
you.

A.    The Supreme Court of Texas?

Q.    Texas, yeah.

A.    Okay.

Q.    And normally, with rules, because of statute
of limitations and jurisdictional filing deadlines, you
want the earlier date, not the later date, right?



1    was riding in the court van back from Plano, Texas.  We

2    were working on our new courthouse there, and I was --

3                 MR. McWILLIAMS:  By the way, is it in

4    west Plano or east?

5                 THE WITNESS:  Yeah.

6                 MR. BABCOCK:  See, I told you.

7                 THE WITNESS:  It's near 121 and the

8    Tollway.  Very nice location.

9                 MR. BABCOCK:  Yeah.

10       A.    But this is just -- you know, when I got back

11   there, I was like, oh, that already happened, because

12   she called me or I talked to Ms. Jeffreys while in the

13   van heading home that afternoon, and she immediately --

14   I'm paraphrasing, but said, have you ever -- have you or

15   your staff ever changed a filing date in a case?

16                 And I said, well, there's only one that I

17   recall adjusting or correcting the filing date, and it

18   involved a patent case filed by Eric Albritton, only

19   time.

20                 And so she quizzed me about that, said she

21   was writing an article about that for deadline soon,

22   wanted just some quotes that she could put in her

23   article, you know, this afternoon was her deadline so

24   she needed something quickly.

25       Q.    They always do that.

1      A.   It was either Rhonda Lafitte, who is the

2  deputy in charge, or Shelley Moore, deputy clerk.  I

3  believe it was Shelley Moore.

4      Q.   Okay.

5      A.   I'm pretty sure it was Shelley Moore that

6  talked to her.

7      Q.   All right.  And the -- what you say to the

8  Texas Lawyer, you go on to say, "She wanted" -- she

9  meaning Amie, correct?

10      A.   Yes.

11      Q.   -- "wanted the clerk's office to change the

12  date to October 16th because she had waited to file the

13  complaint until after the midnight on the 16th."  Did I

14  read that correctly?

15      A.   Yes, uh-huh.

16      Q.   And how did you learn that Ms. Mathis wanted

17  the clerk's office to change the date to October 16th?

18      A.   That was relayed to me by Peggy Thompson of

19  the Tyler clerk's office.  After Ms. Mathis talked to

20  both Ms. Lafitte and Ms. Moore in Texarkana, they both

21  told her we are not authorized to do something like

22  that; you'll have to call Tyler.

23           So she called Ms. Thompson, Peggy

24  Thompson, who is the criminal court reporter, CJ; she's

25  a supervisor.  And then Ms. Thompson relayed the request

1   Thompson relayed to you?  That's just what I want to

2   know right now.

3       A.    Yeah.   The -- it's to change on the docket

4   entry -- where is -- docket sheet.  I'm looking for the

5   docket sheet.

6       Q.    Here you go.

7       A.    Thank you.

8       Q.    It's Exhibit 99.

9       A.    Thank you.  On Exhibit 99, the date in the

10  "date filed" column on page 3 of the then -- of the

11  docket sheet.  It pertains to Document Number 1, and the

12  docket text is that for the complaint.  When I looked at

13  the docket entry on that day, this date filed read

14  10/15/2007.  And what I was told they wanted to change

15  was to change that so it reflected 10/16/2007.

16      Q.    Okay.  So Ms. Thompson told you the request

17  from Ms. Mathis and Mr. Albritton were that they wanted

18  the date filed, which originally showed 10/15/2007, to

19  be changed to 10/16/2007?

20      A.    Yes.

21      Q.    That was the request?

22      A.    Yeah, based on their notice of -- well, their

23  Notice of Electronic Filing that showed that they had

24  finished the --

25      Q.    They had reasons, but that was the request?



1        A.    That was the request.

2        Q.    Okay.

3        A.    To change that date, yes.

4        Q.    Okay.  And as you tell the Texas Lawyer,

5   continuing on in this paragraph --

6        A.    Uh-huh.

7        Q.    -- the Texarkana deputy clerk was reluctant to

8   change the date.

9        A.    Yes.

10       Q.    And referred Amie to the Tyler clerk's office.

11  And as you've just testified, that -- you understood

12  that's what happened?



13       A.    Yes.

14       Q.    And you're not sure whether it was Rhonda

15  Lafitte or Shelley Moore that referred her to the Tyler

16  clerk's office?

17       A.    I think they both talked to her and they both

18  expressed a reluctance and suggested that she talk to

19  us.

20       Q.    Did they tell you why they were reluctant?

21  And I'm talking contemporaneously now, back in October

22  of 2007.

23       A.    No.  You know, the first I heard about it was

24  Peggy coming to me.  I was beginning -- I was, to my



25  recollection, getting ready to go somewhere.  Maybe it


1   was home.  It was close to, you know, afternoon time by

2   my recollection.

3              And the first I heard of it was Peggy

4   coming to me and said, wait, wait, wait, we've got a

5   request here.  I need you to take a look at this.  But I

6   never talked to Ms. -- either of the Texarkana deputies.

7   I can tell you, though, that this, you know, is rather

8   deeply engrained in them, and I think is evinced by

9   their actions, that they would not do something like

10  that without my permission.

11      Q.   Right.  And as Shelley Moore told you in

12  writing, she was a little leery about changing the date,


13  correct?

14      A.   Yeah, uh-huh.

15      Q.   And then she talked to Cindy Paar, and she's

16  even more leery about changing the date?

17      A.   Yeah, yeah.

18      Q.   And did you ever learn about this Cindy -- and

19  we'll find out later today, but about this Cindy

20  Paar/Shelley Moore conversation that made Shelley Moore

21  even more leery about changing the date?

22      A.   I never talked to Cindy about this until just

23  a few days ago.

24      Q.   Okay.  What did Cindy say?


25      A.   She said that the -- she was aware that -- on




Page 65

1       A.    Yeah, but some of it was changed because of

2  the way that the underlying programming worked.  The

3  only thing that she changed was that.  But the computer

4  automatically puts in this modification language.

5       Q.    But the actual stamp at the top of the

6  document -- of the complaint changed as well, you know.

7       A.    Not that.

8       Q.    No, no.  You're talking about the docket

9  sheet.  I'm talking about the complaint itself.  Hang

10  on.  I'll show it to you.

11       A.    Okay.  I wasn't...

12       Q.    Here is Exhibit 21, and you'll see, at the top



13  of the complaint, "Complaint for patent infringement,

14  ESN versus Cisco Systems and Cisco-Linksys, LLC."  It

15  says here case, and it gives the case number and

16  document; and it says filed October 15, 2007?

17       A.    Yeah.

18       Q.    Right?

19       A.    Right.

20       Q.    And then that -- what do you call that, by the

21  way, that thing at the top of the document?

22       A.    Well, it's a header, term of art.  Cindy or

23  David may know the answer to that.

24       Q.    Okay.



25       A.    But that's automatically put in there by the

1    10/16.  That, to me, was the ballgame.

2              I had no doubt then and I have no doubt

3    now that -- and I'm not a judge.  But I'm the clerk of

4    court, and I know a lot about what's at play here, I

5    think.  In my opinion, there was no doubt that those

6    stamps are determinative.  The electronic stamps that

7    say 10/16 for each of those documents on the NEF are

8    outcome determinative of this matter.

9         Q.   Did -- obviously your office was in contact

10   with Mr. Albritton's office.  Do you know whether

11   anybody in your office was in contact with Cisco about

12   this?

13        A.   No.  No, I don't believe anyone was.

14        Q.   Okay.

15        A.   I -- they can tell you, but I am quite

16   confident no one talked to them.

17        Q.   Okay.  And --

18        A.   Of course, at the time that it was filed, the

19   Schell case and the complaint was filed, they chose not

20   to E -- use the e-service feature.

21        Q.   Who is they, Mr. Albritton?

22        A.   Albritton.  When Amie filed that thing, I

23   looked at it.  They didn't put in opposing counsel.

24   They were serving by -- not by our system.  I thought

25   perhaps they had.  Now, I just found that out.  But if



     A.   It's amongst the -- it's an attachment on

these things.

     Q.   Well, in any event, you said you just found '

out -- you got it?

     A.   I'm looking for my e-mail to the Texas Lawyer

because it's got all the attachments.

     Q.   Oh, okay.

     A.   Here we go.  Here we go.  Okay.  We're looking

for the NEF.  Here we go.  This is contemporaneous.

This is what happened at that time.  Notice will be

electronically mailed to.  All she did was put her

boss's name, Eric M. Albritton.  She was the only one



that got a copy of the NEF.

     Q.   Okay.

     A.   And I -- just by looking over the materials, I

discovered that within the last couple of days.  I had

thought, you know, another typical way of doing it and

many attorneys use the e-service feature of our

electronic filing system so that this could be conveyed

directly to the other litigants.  But obviously when

that complaint was filed, it was not.  The only notice

went to Albritton, the only e-mail notice of that, and

of course, to us.

     Q.   Right.  Okay.  But there was a feature that

your office had that, had Mr. Albritton chosen, he could

1    have inputted Cisco data so they would have gotten

2    notice of all these things?

3        A.    Yes.  The procedure is described amongst those

4    documents that I've given you as to how attorneys are

5    trained so they can input the e-mail addresses of -- or

6    from a pick list, take the opposing counsel and put them

7    into the system and they will get the electronic

8    notification.

9        Q.    Okay.  So as -- as Mr. Albritton's office was

10   making this request to change the date from the 15th to

11   the 16th, first to the Texarkana office and then to the

12   Tyler office, as far as you know, Cisco had no input

13   into that request?

14       A.    I didn't -- at that juncture, know -- other

15   than the caption, know who the attorneys were or

16   anything, just they were the defendants.

17       Q.    So my -- the answer is, yes, they didn't have

18   any input into this?

19       A.    They had no input, right.

20       Q.    And you tell the Texas Lawyer in your -- the

21   last -- next-to-last sentence, "Hindsight being 20/20, I

22   should have instructed the Tyler docket clerk to tell

23   Mr. Albritton to file a motion to correct the docket

24   report rather than having the deputy clerk do a

25   correcting entry."  Did I read that correctly?



1        A.    You surely did.

2        Q.    And why did you feel that way?

3        A.    Well, I think at the time that this occurred,

4    when I got the phone call, I was focusing on what I knew

5    about the local rules committee's desire with our

6    procedure to have it work so it reflected the date and

7    time of filing, the -- you know, if there was indicia,

8    clear indicia when the thing -- when they hit the

9    "submit" button on the NEF, which there was, to me, that

10   was the issue being presented.  I was not thinking about

11   defendants.

12              And yet, five, six months hence,

13   reflecting on what happened where, you know, we have

14   lawsuits and things happening, I was of the opinion that

15   it would have been preferable to just tell them file a

16   motion to clarify.  This is a complex venue.

17              Yet at the time that I did authorize the

18   change, it was my clear opinion that the document was

19   timely filed.  And I didn't really have any doubt about

20   it.

21              And yet, when I think back on it, I'm a

22   clerk.  I'm not a judge.  It ought to be -- you know, if

23   it gets down to this, it should have been a judicial

24   determination.  They would have had to ask me and my

25   staff for the same kind of information you're having to

1      Q.   Yeah.

2      A.   Because it didn't do what it was supposed to.

3      Q.   And -- and that's all helpful and I appreciate

4  it.  To get back to my question --

5      A.   Yes.

6      Q.   That's okay.  It -- and I'm not being critical

7  of the way you handled it, but I'm just saying that your

8  letter to the Texas Lawyer would seem to indicate --

9      A.   Yes.

10      Q.   -- that, if this came up again, you would give

11  notice to both sides and let the judge decide whether

12  the docket entry should be changed?

13      A.   Absolutely.

14      Q.   Is that true?

15      A.   Yes, absolutely.

16      Q.   Let me ask you to look at Exhibit 88, and

17  this, the bottom of it, it's your letter to the Texas

18  Lawyer.  But then above it, it's an e-mail from you to

19  Faye Thompson, Shelley Moore, and Rhonda Lafitte.  And

20  you say -- dated March 14, 2008, "Here for your

21  information is a memo I sent to the Texas Lawyer with

22  copies to Chief Judge Heartfield and Judge Folsom

23  regarding the matter above.  It represents, to the best

24  of my knowledge, what happened in this case.  There is

25  pending litigation involving the facts below in state



Q.   Yeah.  My question was bad because that's not
what I was going to.

A.   Yeah.

Q.   Was there a mistake made by the clerk's office
in -- hang on.

A.   Pardon me.

Q.   Was there a mistake made in the clerk's office
in handling the initial filing?  Forget about the
correcting entry.  I'm just talking about the initial
filing.

A.   None at all.  Thank you for slowing me down.
But none, no mistakes at all.

Q.   Okay.  And now, moving -- and you corrected
me, too, so we both pat each other on the back.

        Moving forward to the correcting entry,
you don't think your office did anything wrong, but in
hindsight, it would have been better if there had been a
motion filed?

A.   It would have been better to have a motion
filed, and I should have sent -- I should have
alerted -- once I became aware of counsel -- the defense
counsel, they should have been put into the loop.

Q.   Okay.  We're out of tape.  Thanks.  We'll take
a quick break, and I'm nearing the end if you can
believe this.

1    Tyler and just things like that.

2        Q.   Other -- other than logistical e-mails about

3    just getting here and that type of thing, are there any

4    other documents you've withheld?

5        A.   No, no.

6        Q.   Okay.  And are either Mr. Gibson or Mr. Wells

7    representing you as your attorneys in this?

8        A.   Only -- they are representing the interest of

9    the United States and not us.  That was another helpful

10   clarification that they provided us with.  They're here

11   to ensure that the scope of the testimony doesn't go

12   outside of our, you know, specifics on the Tuohy

13   regulations.

14       Q.   Sure.  Just another couple of questions.

15   First of all, I've noticed, just by looking at the PACER

16   in the eastern district, that sometimes you'll see

17   entries that say filed in error or there will be some

18   indication like that.

19       A.   Yeah, yeah.

20       Q.   I noticed in this case, however, the docket

21   entry of October 15th, 2007, has completely disappeared

22   from the system.  Can you -- number one, do you know

23   that to be true?

24       A.   The docket entry for the complaint?

25       Q.   Yeah.  The docket entry that said



October 15th --

     A.   Oh.

     Q.   You know what I'm saying?

     A.   Right.  Yeah, that -- that disappeared when
Faye Thompson made that correcting -- I mean, that --
that's the one thing that disappeared.  And yet, from
the transaction log, you can see that that adjustment
was made.  And when I first saw the docket sheet, it
said October 15th.  But once that change was made, it
changed it in the database.

     Q.   Okay.  Why wouldn't it show filed in error as
you do other?  What's the distinction between that?

     A.   Filed in error is a procedure that is used
primarily for what we call quality control events, but
they are -- when attorneys -- and this, again, is a
provision in our local rules.  We are not authorized to
reject documents for failure to comply with the rules.

          Nonetheless, this court and many courts
have authorized the clerk's office to, in effect,
monitor electronic filings for rule compliance.  And so,
say if you submitted a document that lacks something
significant, sometimes the document would be withdrawn
and then resubmitted in the proper format.

          But it's primarily to do with our function



of quality control and looking at those documents and,

1    A.    And then they've also -- if they're looking at

2    the Notice of Electronic Filing, which is really the

3    document that all of us ought to be looking at because,

4    under the rules, that is the -- it's not what a docket

5    clerk puts under Document Number 1.   It's the -- what

6    does the NEF say.

7    Q.    But --

8    A.    But that was kind of where I was coming from.

9    But looking back on all the difficulty this has caused

10   and what -- you know, perhaps a better course of action

11   at the time, knowing what I know now, you know, there's

12   no way, if this situation occurred again, that we would

13   do the same thing, that we would make an adjusting

14   entry.   We would hopefully fix it before then, but we're

15   not going to touch another similar case like this.   We

16   would leave it up to a judge.

17   Q.    And the reason for that is that a judge would

18   have all the facts available like you provided the Texas

19   Lawyer?

20   A.    Yes, right.

21   Q.    The public would have those facts available?

22   A.    Yes.

23   Q.    And the explanation would be there for

24   everyone to take a look at?

25   A.    Right.   That -- hindsight being 20/20, that

1  reference the complaint, and it does evidence a change

2  in the date filed; but it does not mention 10/15 in that

3  text.

4      Q.   We may have this already marked as another

5  exhibit.

6          MR. McWILLIAMS:   Chip, I'm going to use

7  your sequence here.

8          MR. BABCOCK:   Sure.

9          (Exhibit Number 111 was marked.)

10     Q.   (BY MR. McWILLIAMS)   Marked as Exhibit 111,

11 and can you identify what that exhibit is?

12     A.   That is -- well, it's -- are these a copy of

13 the same?  Yeah, you just want me to -- this appears to

14 be a copy of that.

15     Q.   Right, right.  Just identify the first two

16 pages.

17     A.   Yeah, okay.  Yeah, yeah, this is a copy of the

18 docket sheet that shows the way that it looked before

19 Ms. Thompson corrected that entry.

20     Q.   All right.  And what -- what does it say the

21 filing date of the complaint is?

22     A.   October 15, 2007.

23     Q.   Now, that is the docket sheet and the filing

24 date that is now gone?

25     A.   Yeah.  But it is indicia of how it looked.



1    the 20 some-odd pages following had a file date of

2    October the 15th, 2007, did it not?

3        A.    Right.  Yes.

4        Q.    Did you send a copy of that complaint in the

5    exhibits to the Texas Lawyer?

6        A.    No.  I mean, the first time I'd seen that

7    complaint with the header on it was today.  But even

8    with or without the header, of course, any -- any

9    printing of that document out of the database would

10   have -- after the case is filed, that header appears on

11   everything.

12       Q.    I understand.

13       A.    On every page.

14       Q.    So if --

15       A.    But I did not send the complaint as part of my

16   attachments because I was focusing, as we should, on the

17   Notice of Electronic Filing.

18       Q.    I understand.  So if a member of the public,

19   on this same October 16th date at 9:40 a.m., had looked

20   at the complaint, it would have had the October 15th

21   filing date across the top?

22            MR. HOLMES:  Objection, form.

23       A.    At any time, you're correct, yeah, it would

24   have had that.

25            MR. HOLMES:  Objection, form.

A.    Yes.   It was in November of 2007.   It's that
local -- pardon me -- General Order 07-9 was the order
amending the local rules.

Q.    And Mr. Albritton became a member of the local
rules committee on what date?

A.    It would have been in the spring of 2008.
That -- there's a particular rhythm to the way that our
rules committee works.  We -- the appointments are made
typically in May of a year, and I send a letter out in
June welcoming the new ones.   There's generally four new
ones every year.

Q.    And I believe you said that Mr. Albritton was
appointed by Judge Davis?

A.    Judge Davis.   And so he would have been
appointed by Judge Davis sometime in May of 2008.   The
letter would have gone out June of 2008 or maybe late
May, and we had a physical meeting in that courtroom,
Judge Steger's courtroom, sometime in July of 2008.

Q.    Are all the members of the rules committee
appointed by the federal judges --

A.    Yes.

Q.    -- in this --

A.    There are some standing appointments.   The
then-current U.S. attorney, anybody can -- she or he can
delegate their position to others.   Also, the

about litigating patent cases in the Eastern District of

Texas, to your knowledge?

     A.    No.

     Q.    Now, what do you take this to mean, "the

banana republic of East Texas"?

     A.    Well, I'm aware that -- I mean, the

implication is that our court is some kind of

plaintiffs' clip joint and that it favors, you know,

plaintiffs over -- or at least favored certain parties

over others, that it's less than unbiased.  That's what

it implies to me.  Banana republic is sort of a place

that, in common parlance, I think means that it's sort

of a dictatorship that invites money to come their way,

that it's some kind of ill-gotten gains there.  That's

what it means to me.  It has a negative connotation.

     Q.    Is there any truth to it?

     A.    No.

     Q.    Now, continuing on down the first page,

there's another posting.  This one's dated Wednesday,

October 17th, 2007.  Do you see that one?

     A.    Yes.

     Q.    Would you read the title of that one for us?

     A.    "Troll Jumps the Gun, Sues Cisco Too Early."

     Q.    Now, what is a troll, Mr. Maland?

     A.    Well, I do know, you know, a troll -- I was --

1      ought to know exactly what was being sent to them.  And

2      he was aware of it prior to me sending.

3          Q.    Did either Judge Heartfield or Judge Folsom

4      criticize or ask you to change anything --

5          A.    No.

6          Q.    -- in what you submitted to them?

7          A.    No.

8          Q.    Let me ask you to clear this up for me.  A

9      couple of these e-mails indicated that at least one of

10     the clerks communicated to you that she was -- the word

11     she used was "leery"?

12         A.    Yes.

13         Q.    She was leery of making any change to the

14     docket?

15         A.    Right.

16         Q.    Is that an inappropriate response on her part?

17         A.    No.

18         Q.    Why not?

19         A.    Because the deputy clerks are trained that any

20     kind of adjustment -- now, there's a difference between

21     the type of situation we talked about before where --

22     docketed in error.  We do that kind of thing all the

23     time.  Things get -- either because of an error on the

24     attorney's part or error in the clerk's office part,

25     they get a notation made.  It is rare that we would do a



1    they started loading the documents, and that was

2    vexatious to them and therefore asked for help

3    clarifying that.  And they asked the help of my office

4    who appropriately sent the question to me.

5              And being as involved as I am in the

6    local rule formulation process, the process to even

7    provide an instrumentality for electronic filing, I had

8    a background that my deputies didn't and I made a

9    decision to -- based on the document, the NEF that was

10   available, it was clear to me that that's what exactly

11   happened.  They had followed the procedures.  They were

12   trying and did tender the document electronically



13   shortly after midnight and you could -- I could tell

14   from the documents then at hand and I made a decision to

15   authorize my deputy to change the file date -- date

16   filed in Column 1 on Document Number 1 on the docket

17   sheet, which really -- quite frankly, even that's not

18   dispositive.  It's the NEF that matters.

19        Q.   Does the content --

20        A.   That's what -- I guess because the NEF

21   controlled is why we did it, because I felt that that

22   clarification was, under our rules, appropriate, that

23   that's when in fact -- and I could clearly tell that's

24   when the documents were tendered.

25        Q.   Do the contents of Exhibit 31 bear any

1  we've been going up until last year, and some of that

2  is -- the diminution between '07 and '08 would be a loss

3  of -- prisoner cases have gone down a bit.

4          MR. BABCOCK:  Darn.

5          THE WITNESS:  Yeah.

6      A.   But generally speaking, our court, up until

7  this last year, has been bucking a national trend where,

8  because of tort reform initiatives in many states and --

9  civil case filings across the country have been

10 dropping, and ours have maintained a certain amount of

11 steadiness to them.

12     Q.   (BY MR. McWILLIAMS)  Would it be fair to say

13 that over the last five years, there have been from 10

14 to 15,000 cases filed in the eastern district?

15     A.   Yeah, that'd be about right, somewhere in

16 there.

17     Q.   And just going back over the last five years

18 and the 10 to 15,000 cases that have been filed, I

19 understand it's your testimony that you've never been

20 asked to change a docket filing date up until this case?

21     A.   Right, not like this, that -- no, I've never

22 had that -- this kind of question presented to me.

23     Q.   And I believe it's Exhibit 111.  We'll find

24 the exhibit, but I --

25          MR. BABCOCK:  What are you looking for?

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERIC M. ALBRITTON            )
                             )
v.                           )
                             )   C.A. NO. 6:08-CV-00089
CISCO SYSTEMS, INC.,         )
RICK FRENKEL, MALLUN YEN &   )
JOHN NOH                     )


REPORTER'S CERTIFICATION
DEPOSITION OF DAVID MALAND
NOVEMBER 3, 2008


    I, April Eichelberger, Certified Shorthand Reporter

in and for the State of Texas, hereby certify to the

following:

    That the witness, DAVID MALAND, was duly sworn by

the officer and that the transcript of the oral

deposition is a true record of the testimony given by

the witness;

    That the deposition transcript was submitted on

_____ to the witness or to the attorney

for the witness for examination, signature and return to

me by _____ ;

    That the amount of time used by each party at the

deposition is as follows:

        MR. BABCOCK......2 hours, 33 minutes

        MR. McWILLIAMS...37 minutes

        MR. HOLMES.......1 hour, 5 minutes;

1        That pursuant to information given to the deposition

2    officer at the time said testimony was taken, the

3    following includes counsel for all parties of record:

4        FOR THE PLAINTIFF:

5            Mr. James A. Holmes

6        FOR THE DEFENDANT CISCO SYSTEMS, INC.:

7            Mr. Charles L. Babcock, Ms. Crystal J. Parker

8        FOR THE DEFENDANT RICHARD FRENKEL:

9            Mr. George L. McWilliams

10       FOR THE WITNESS:

11           Mr. Thomas E. Gibson, Mr. Bob Wells

12       That $_____ is the deposition officer's charges

13   to the Defendant for preparing the original deposition

14   transcript and any copies of exhibits;

15       I further certify that I am neither counsel for,

16   related to, nor employed by any of the parties or

17   attorneys in the action in which this proceeding was

18   taken, and further that I am not financially or

19   otherwise interested in the outcome of the action.

20       Certified to by me this _____ day of

21   _____, 2008.

22

23

24   _____
     April Eichelberger
     Texas CSR No. 7495
25   Expiration Date:  December 31, 2009



1      That pursuant to information given to the deposition

2  officer at the time said testimony was taken, the

3  following includes counsel for all parties of record:

4      FOR THE PLAINTIFF:

5          Mr. James A. Holmes

6      FOR THE DEFENDANT CISCO SYSTEMS, INC.:

7          Mr. Charles L. Babcock, Ms. Crystal J. Parker

8      FOR THE DEFENDANT RICHARD FRENKEL:

9          Mr. George L. McWilliams

10     FOR THE WITNESS:

11         Mr. Thomas E. Gibson, Mr. Bob Wells

12     That $_____ is the deposition officer's charges

13 to the Defendant for preparing the original deposition

14 transcript and any copies of exhibits;

15     I further certify that I am neither counsel for,

16 related to, nor employed by any of the parties or

17 attorneys in the action in which this proceeding was

18 taken, and further that I am not financially or

19 otherwise interested in the outcome of the action.

20     Certified to by me this 5th day of

21 November_____, 2008.

22

23

24 _____
   April Eichelberger

25 Texas CSR No. 7495
   Expiration Date:  December 31, 2009

0fcf60b9-dc5a-4208-9af6-db3df4461427