# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| ERIC M. ALBRITTON, | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| v. | § | No. 6:08cv00089 |
| | § | |
| CISCO SYSTEMS, INC. RICHARD | § | |
| FRENKEL, MAULLUN YEN and | § | |
| JOHN NOH, | § | |
| | § | |
| **Defendant** | § | |

# PLAINTIFF'S RESPONSE TO DEFENDANTS'
# MOTION FOR JUDGMENT AS A MATTER OF LAW

Plaintiff Eric Albritton file this response in opposition to Defendants' Motion for Judgment as a Matter of Law as follows:

1. Response to JMOL #1:  The Court's Ruling Precluding Mr. Albritton From Seeking Recovery For Reputational Damages Does Not Defeat His Libel Cause of Action

Defendants argue that this Court's Order precluding Plaintiff from recovering reputational damages means that he has no cause of action for libel to submit to the jury.  *See* D.E.  302 at 2-3).   Defendants' JMOL fails for three reasons.

First, Plaintiff need not seek to recover reputational damages to maintain a cause of action for defamation.   Defendants' position was rejected in *Time, Inc. v. Firestone*, 424 U.S. 448, 460 (U.S. 1976).  There, Time argued that because Firestone withdrew her claim for damages to reputation on the eve of trial, there could be no recovery in defamation. The Court held Firestone's decision to forgo recovery to reputation did not prevent her from obtaining other damages. *See id.*

Second, Plaintiff has presented a cause of action for libel per se.[1]  In a claim for defamation per se, the Plaintiff is not required to prove the words caused him injury in order for them to be "actionable," harm to reputation is presumed.  *Fiber Sys. Int'l v. Roehrs*, 470 F.3d at 1150, 1161 (5th Cir. 2006); *see also Leyendecker & Assoc., Inc. v. Wechter*, 683 S.W.2d 369, 374 (Tex. 1984).  The Court's Order precluding Plaintiff from recovering *damages* for harm to his reputation does nothing to erase the presumption of *injury* to reputation he is afforded by law; it only means he cannot recover damages for his presumed harm. *See Time,* 424 U.S. at 460.

Third, even a showing of injury to reputation is required—and it is not—Plaintiff has presented sufficient evidence of harm to his reputation to have the issue submitted to the jury. The nation wide dissemination of the Troll Tracker is circumstantial evidence of the harm caused

---

[1] The case cited in Defendants' motion affirms Plaintiff's position.  In *Leyendecker & Assoc., Inc. v. Wechter*, 683 S.W.2d 369, 374 (Tex. 1984), the Defendant accused Mr. Wechter of asking Defendant to submit fraudulent insurance claims.  *See id.* at 374.  Defendant did not accuse Mrs. Wechter of the same conduct.  *See id.* at 376.  The Court held that Ms. Wechter could not recover for defamation because she failed to offer any proof that that accusations tended to injure her reputation.  However, because the statements accused Mr. Wechter of committing a criminal act by attempting to conspire with Defendant to file fraudulent insurance claims, he was entitled to a presumption of injury to his reputation.  *See id.* 375.

to Plaintiff's reputation. *See Alioto v. Cowles Comms., Inc*. 430 F. Supp. 1363, 1372 (N.D. Cal. 1977) (widespread dissemination evidence of harm to reputation); *see also Salem El-Hadad v. Embassy of the United Arab Emirates,* 2006 U.S. Dist. LEXIS 21491, at *49-50 (D.D.C. Mar. 29, 2006) (same). Record evidence at trial demonstrates that the Troll Tracker was widely disseminated and read. *See* Plaintiff Exhs. 327a (Troll Tracker stating that he is getting more email about the ESN case than just about anything else); 348 (noting that the Troll Tracker Blog has had over 100,000 visitors); 356 (noting the breadth of the Troll Tracker's audience); 406 (devoted following in patent law circles); 473 (blog has become required reading for patent lawyers); 09/17/09 Trial Tr. at 53:21-54:1 (ability to obtain accused article via a Google search). Moreover, there was evidence presented at trial demonstrating that Plaintiff's reputation has in fact been harmed. *See* 09/17/09 Trial Tr. at 42:11-15; 43:16-44:11; 09/15/09 Trial Tr. at 515:12-16; 09/16/09 Trial Tr. at 769:11-15; 770:10-16.

    2.    Response to JMOL #2: There Is Sufficient Evidence To Submit To The Jury The Questions Raised In Defendants' JMOL Motions Regarding The Defamatory Meaning Of The Accused Articles

Defendants seek judgment as a matter of law that the articles at issue are non-actionable on numerous grounds, including substantial truth, rhetoric, hyperbole, opinion, not defamatory, or not "of and concerning" Mr. Albritton. *See* D.E. No. 302 at 3-9. Each of Defendants' grounds raise fact issues within the province of the jury for which there has been sufficient evidence introduced at trial.

    A.   The Defamatory Posts Are False

Though Defendants' posts about Albritton are demonstrably false, Cisco contends that JMOL is appropriate because the defamatory statements are "substantially true." *See* D.E.302 at 3-5. But, substantial truth cannot be proven by the subset of facts, as argued in Cisco's motion. *See Cram Roofing Co., Inc. v. Parker,* 131 S.W.3d 84, 90. (Tex. App.—San Antonio 2003).[2] Rather,

---

[2]    The burden to demonstrate substantial truth is on Cisco. *See Cram Roofing Co. v. Parker*, 131 S.W.3d at, 90 ( "The affirmative defense of substantial truth is a complete defense, **and the burden is on the defendant** -- here, Cram Roofing -- to prove the truth or substantial truth of the allegedly defamatory statement.") (citing *Tatum v. Liner*, 749 S.W.2d 251, 256 (Tex. App.--San Antonio 1988, no writ).

the substantial truth principle protects minor inaccuracies of fact from liability where they have no real impact on the gist, or the sting, of the libelous charge. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 517 (1991). Cisco must prove that Frenkel's posts, taken as a whole, were no more damaging to Albritton's reputation, in the mind of the average listener, than a truthful statement would have been. *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 114 (Tex. 2000). This Cisco cannot do because the record contains ample evidence that Frenkel accused Albritton of criminal and unethical conduct when no such conduct occurred. *See* 9/14/09 Trial Tr. at 181:20-182:7, 234:16-20, 245:21-23;  9/15/09 Trial Tr. at 751:21-752:15, 770:4-9 *See id.* There is more than sufficient evidence for a reasonable jury to find for Albritton on this issue.[3]

Cisco's argument hinges on its assertion that the "gist" of Frenkel's posts is that Albritton contacted the clerk's office *ex parte* and had the clerk change the official court documents to reflect an earlier filing date, instead of filing a motion with the Court.  Cisco's disingenuous depiction of the posts is belied by the fact that the posts don't mention the word "*ex parte*" or comment that Cisco wasn't contacted by Albritton.  The posts do, however, make false accusations that Albritton signed a civil cover sheet "stating that the complaint had been filed on October 15th" that he amended the ESN complaint to change nothing but the filing date, and that he "convinced" the court to change the date.  The clear meaning is that Albritton conspired with the clerk to alter government records to create subject matter jurisdiction so the case could proceed in the Eastern District.  Cisco's attempt to recast the accusations now for purposes of JMOL is simply not credible. Indeed, that the record contains the differing meanings the parties' ascribe to the gist of posts alone is sufficient to bar JMOL. *See Cram Roofing Co.,* 131 S.W.3d at 90-91 ("When the gist of the defamatory statement - that is, the essential meaning of the statement - is subject to differing interpretations, a fact question arises."); *See Scripps Tex.*

---

[3]     Contrary to Cisco's argument and as discussed below, the facts, as well as Cisco's characterization of the facts, that underlie the gist of the posts are anything but undisputed. As such, this issue may not be decided as a matter of law. *Cram Roofing Co., Inc. v. Parker,* 131 S.W.3d at 90. ("Obviously, if the underlying facts are disputed, then a fact issue arises").

*Newspapers*, *L.P. v. Belalcazar*, 99 S.W.3d 829, 836 (Tex. App.--Corpus Christi 2003, pet. denied) (holding fact issues precluded summary judgment on substantial truth defense); *Entravision Communications Corp. v. Belalcazar*, 99 S.W.3d 393, 398 (Tex. App.--Corpus Christi 2003, pet. denied) (same); *TSM AM-FM TV v. Meca Homes, Inc.*, 969 S.W.2d 448, 452 (Tex. App.--El Paso 1998, pet. denied) (holding summary judgment evidence failed to establish the truth or substantial truth of the statements as a matter of law). *Allied Mktg. Group Inc. v. Paramount Pics. Corp.*, 111 S.W.3d 168, 176 (Tex. App. Eastland [11th Dist] 2003); *Scripps Texas News. v. Belalcazar*, 99 S.W. 3d 829, 836 (Tex. App. Corpus Christi [13th Dist] 2003).

Because the gist of the post was that Albritton engaged in criminal conduct, Cisco must prove Albritton's conduct was criminal before it can prevail on a substantial truth defense. *See Golden Bear Dist. Sys. of Texas v. Chase Revel, Inc.*, 708 F.2d 944, 949 (5th Cir. 1983) ("for the truth defense to apply, the defamatory interpretation of the article [must] be true."). Cisco's motion makes no attempt to prove Albritton's conduct was criminal, nor can it. Absent proof of criminal conduct, Cisco's motion must fail. *Id.* Even if the "gist" of the posts had been that Albritton contacted the clerks *ex parte*, as masqueraded by Cisco, there is no doubt that the posts imply that Albritton's conduct was improper. Here too Cisco must prove that Albritton engaged in improper conduct. Because there was nothing improper about Albritton's conduct, Cisco's statements are false. *See, e.g., Bentley v. Bunton*, 94 S.W.3d 561, 588 (Tex. 2002) (allegations of improper *ex parte* discussions not true where contact was not improper).

Cisco's motion also ignores the factual disputes at issue, making JMOL unattainable. For example, Cisco continues to ignore or dispute that the official court record of the ESN filing is the Court's Electronic File <u>Stamp</u>, which at all times has shown that the complaint was filed on Oct. 16th. See Plaintiff's Exh. 32. As Dave Maland, the Clerk of Court, testified the Electronic File Stamp ("EFS") is by local rule the official record of the filing of the complaint. *See* 09/15/09 Trial Tr. at 367:4-369:18; *see also* Plaintiff's Exh. 32, 78, 216; 09/14/09 Trial Tr. at 164:2-23; 165:15-166:9; *See* 09/15/09 Trial Tr. at 263:19-264:3. No one ever asked the Court to change the filing stamp as alleged by Cisco. Thus, the "date" the ESN complaint was filed never

changed, and is in fact is incapable of being changed.  *See* 09/15/09 Trial Tr. at 369:11-18; 378:23-379:1.  There was no conspiracy to later documents to create subject matter jurisdiction to benefit ESN.  *See* 09/14/09 Trial Tr. at 180:17-181:3; 09/15/09 Trial Tr. at 281:7-25; 380:18-20.  Frenkel's accusations were, and continue to be, undeniably false.[4]

Cisco's motion also ignores the totality of Frenkel's statements.  Cisco urges the court to focus on a handful of selective facts so as to disguise the false and defamatory impression created by Frenkel's posts.  But, the law does not permit such obfuscations.  Where, as here, the publication may include some truthful facts but fails to put them in the proper context resulting in a false impression, it is defamatory.  *See Turner v. KTRK Television, Inc.* , 38 S.W.3d 103 (Tex. 2000) at 114-15; *Golden Bear*, 708 F.2d at 949 (it is not a defense to show that a statement in a publication if taken alone is true, a showing of truth requires showing that the overall impression made by the publication is true).  To illustrate Cisco's flawed argument, *Turner v. KTRK Television,* is instructive.  There*,* the court held that "a plaintiff can bring a claim for defamation when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way."  *Turner,* 38 S.W.3d at 115.  The Turner broadcast questioned a mayoral candidate's involvement in his former client's multi-million-dollar insurance scam. *Id.* at 111. While Turner's role was limited to drafting and probating the client's will, the report gave the false impression that he was involved in the conspiracy to fake the client's death.  *Id.* at 117-19.  The Texas Supreme Court concluded that the broadcast as a whole was substantially false and defamatory, because it "cast more suspicion on Turner's action than an accurate account would have warranted."  *Id.* at 119; *see also Texas Disposal Sys. Landfill, Inc. v. Waste Mgmt Holdings*, 219 S.W.3d 563, 583 (Tex. App.—Austin 2007) (statements defamatory as a result of the false impressions and inferences).

---

[4]     The fact that Frenkel was wrong is sufficient to establish liability for defamation.  *See Brown v. Petrolite Corp.*, 965 F.2d 38, 44 (5th Cir. 1992) (where defendant made allegations that plaintiff sold a defective product, but statements were made as a result of unknowingly testing the wrong product, the statements were nonetheless false and defamatory).

An accurate account of the facts shows that Albritton filed the ESN complaint on October 16th, the Court's electronic filing system logged the wrong date on the docket and on the optional document header.  *See* 09/14/09 Trial Tr. at 171:18-173:9; 09/15/09 Trial Tr. at 280:10-17. Amie Mathis office contacted the court clerk as instructed by the court's website and electronic filing manual to determine what could be done to correct the docket entry.  *See* 09/14/09 Trial Tr. at 169:18-170:7; 09/15/09 Trial Tr. at 273:11-275:13.  None of these facts give rise to the criminal conduct Frenkel alleged.  *See* 09/14/09 Trial Tr. at 181:20-182:7.  Because Frenkel's allegations cast more suspicion on Albritton's actions than an accurate account would have warranted, they cannot be "substantially true."  *Turner,* 38 S.W.3d at 114-15.

> B.  The Posts Contain False Factual Assertions, Not Opinion, Hyperbole or Rhetoric

Cisco next contends that JMOL is appropriate because its use of the word "conspiracy" can only be understood as an epithet, rhetorical hyperbole or opinion. D.E. 302 at 5-9.  Cisco's motion both ignores and distorts the record evidence. The posts themselves reveal that Frenkel presented far more than his opinions to his readers; he asserted factual statements that, when examined on this record, are verifiably false. Try as it might, Cisco cannot rewrite Frenkel's posts in motion practice to justify JMOL on grounds of opinion.

As it did at summary judgment, Cisco persists in advancing two Supreme Court decisions from the 1970s, *Greenbelt Coop. Publ'g Ass 'n, Inc. v. Bresler*, 398 U.S. 6 (1970) and *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264 (1973). Remarkably, Cisco again fails to recognize or inform the Court of the important clarification the Supreme Court announced in *Milkovich v. Lorain Journal Co.,* 497 U.S. 1 (1990), a clarification that undermines Cisco's entire argument. *Bentley,* 94 S.W.3d at 579 (Texas is bound to follow the Supreme Court's latest word on the subject, *Milkovich v. Lorain Journal).*  In *Milkovich,* the Supreme Court expressly distinguished *Greenbelt* and *Letter Carriers,* finding those holdings only provided protection to statements that "<u>cannot 'reasonably [be] interpreted as stating actual facts' about an individual</u>." *Milkovich,* 497 U.S. at 20. The

*Milkovich* Court was asked to consider whether an accusation that Milkovich "lied" during a judicial proceeding was an opinion. *Id.* at 21. The Court found that the statement made was not the sort of loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously making criminal allegations. *Id.* at 21. Nor did the general tenor of the article negate that impression. *Id.* at 21. Moreover, because the statement could be determined true or false by comparing Milkovich's statements with his court testimony, it was immaterial whether the statement was <u>intended</u> as opinion, they were actionable at law.' *Id.* at 19-22.

Since *Milkovich,* courts have properly rejected over reliance on the *Greenbelt* and *Old Dominion* cases advanced by Cisco. In *Bentley v. Bunton,* the Texas Supreme Court held that statements made on a call-in television talk show accusing a judge of being corrupt were statements of fact; not opinion. 94 S.W.3d at 583-84. The Court found it significant that, like Frenkel, the talk show host stated that his accusations were based on actual fact, claimed to have investigated the alleged incidents demonstrating corruption, cited specific cases, claimed to have looked into the applicable law and found that it supported his position, pointed to court records and public documents, and stated that he had evidence not disclosed to others. *Id.* The host in *Bentley* also maintained that his statements were true all the way through trial, a fact that the Court found to be evidence that his statements were factual in nature. *Id.* Although the host often claimed it was his opinion the judge was corrupt, the *Bentley* Court found his attempt to couch his statements as opinion was immaterial in light of the factual accusations he made. *Id.*

In *Super Future Equities, Inc. v. Wells Fargo Bank Minn.,* the Northern District of Texas relied upon *Milkovich* and *Bentley* to reject the defendant's argument that his allegations of fraudulent and criminal conduct were mere opinion because, like here, the statements were sufficiently factual and provable. 553 F. Supp. 2d at 687. The Court reasoned that the defamatory statements made accusations of specific behavior, accused the plaintiff of lying and wrongdoing and purported to offer factual information about the plaintiff's behavior. *Id.* at 688-89. The defendant's web site provided links to court documents and court cases, and, like Frenkel, the defendant claimed to have verified the accuracy of the factual information he posted. *Id.*

Although the defendant claimed the information posted was private information and opinion, the Court held that because the statements made false representations of fact capable of verification, they were not opinions. *Id.*

Here too, the statements made on Frenkel's blog were offered as statements of verifiable fact. The purpose of Frenkel's blog was to give factual information to those interested in patent litigation. Frenkel's Oct. 17 and 18 posts purport to provide facts he claimed to have already investigated and verified, saying, for example, "I checked, and sure enough, that's exactly what happened." *See* Plaintiff's Exh. 335. Frenkel assured the reader that <u>he was right</u> (emphasis in original), that there was "proof" of Albritton's misdeeds, and that he didn't see how there could have been a mistake. *See id.* Frenkel made specific factual allegations that Albritton's communications with the court clerk were conspiratorial, made factual allegations concerning the motive for Albritton's criminal activity, cited references he claimed supported his version of the facts, cited case law, identified court records and the court docket, impressed upon the reader his understanding of court procedures, and noted that he had received an anonymous email that the readers did not have access to, all to covey false facts that Albritton conspired with the court clerk to alter an official record for a fraudulent and unlawful purpose. *See* Plaintiff's Exhs. 251, 214. To this day, Frenkel insists that his statements of fact were correct. *See* 09/14/09 Trial Tr. at 132:6-7. Thus, under the rule announced *in Milkovich,* Frenkel's defamatory accusations are not opinions. *Milkovich,* 497 U.S. at 21; *Super Futures,* 553 F. Supp. 2d at 688-89, *Bentley,* 94 S.W.3d at 584.

Moreover, Frenkel's allegations were not couched hyperbolically, figuratively or in any other way that would convey that Frenkel didn't seriously mean what he said. Unlike the defendants in *Super Futures* and *Bentley,* Frenkel didn't ever use the word "opinion" in his October posts, although in prior posts he made clear when he was offering an opinion. In an attempt to create an opinion where none exists, Cisco argues that Frenkel's comment that the clerks were either "wittingly or unwittingly" conspiring with Albritton demonstrates that his comments can only be understood by the reasonable reader as opinion. Cisco's argument is

nonsensical. First, Frenkel's accusations need not be provable in a court of law to be defamatory. Indeed, the very hallmark of a defamation action is that the statements are not true. Second, a conspiracy can be shown with a meeting of the minds as to the course of action: the allegations made in Frenkel's post. *See Super Future,* 553 F. Supp. 2d at 695. Third, it is the allegations against Albritton that are at issue in this case. If Albritton had altered a governmental record as Frenkel claimed, he would be guilty of a crime separate and apart from any criminal liability that may befall the court clerk. Cisco's arguments to the contrary regarding civil conspiracy are desperate and transparent attempts to confuse the Court. The record contains more than sufficient evidence that the defamatory posts about Albritton are not opinions and thus are actionable. *Milkovich,* 497 U.S. at 21-22.

### C. The Posts Are Actionable In Their Entirety

"It is well settled that the meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements." *Bentley*, 94 S.W.3d at 579. The October 17 and two October 18th posts are actionable in their entirety. Cisco persists in its misguided campaign to parse and isolate individual statements from the three posts at issue. In this regard it concludes that JMOL is somehow appropriate on the faulty basis that Frenkel's "Banana Republic" comment is not of and concerning Albritton.

Given the temporal proximity of the posts, an average reader would not evaluate them in isolation, but would consider them together.[5] *See* Plaintiff's Exhs. 214, 251. Cisco's accusations appeared in consecutive posts. The October 17 post identifies the factual predicate, including identifying Albritton, falsely stating that the complaint was filed on October 15th and that an amended complaint was filed that changed nothing other than the filing date that sets the stage

---

[5]    *See Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 185 (2d Cir. N.Y. 2000) (considering multiple articles together, in context, to test their effect on the average reader); *November v. Time, Inc.,* 194 N.E.2d 126, 128 (N.Y.1963) (rejecting defendants attempt to parse statement and stating that if "every paragraph had to be read separately and off by itself plaintiff would fare pretty well. But such utterances are not so closely parsed by their readers or by the courts and their meaning depends not on isolated or detached statements but on the whole apparent scope and intent.").

for the October18 post.  The October 18 post does not rehash the facts of the prior post, but builds upon them to accuse Albritton of conspiring to alter official governmental records for the express purpose of manufacturing subject matter jurisdiction. The modified October 18 post was likewise read in connection with the post of October 17. Albritton is both identified by name and by his association in a local counsel group comprised of just him and one other lawyer. Any reader of the posts would conclude that the statements are about (or of and concerning) Albritton. Collectively – including the words Banana Republic – the posts are defamatory of Albritton because, taken as a whole, they add the false and defamatory impression that Albritton committed a crime or otherwise engaged in conduct that is unbefitting a member of the Bar.

Defendants' JMOL invites the Court to make credibility determinations and to evaluate the sufficiency of the evidence, which is squarely the province of the jury.  Defendants' JMOL number 2 should be denied.

> 3.   Response to JMOL 3:  The Issue of Libel *Per Se* Should Be Submitted To The Jury Or Resolved In Plaintiff's Favor

Defendants argue that the defamatory posts cannot be libelous *per se* as a matter of law.  *See* D.E. No. 302 at 9-10 (grounds for JMOL #3).

Defendants' begin with the assertion that the Court must decide the per se issue and it can never be resolved by the jury.  Plaintiff agrees that whether the accused articles are libelous per se is generally an issue of law that courts decide.  However, the issue is properly presented to the jury if the issue cannot be declared as a matter of law.  See *Texas Disposal,* 219 S.W.3d at 581 ("The issue of whether statements are defamatory per se is generally a matter of law to be decided by the court…."  The court may, however, pass the inquiry to the jury if it determines that an ambiguity exists about the meaning and effect of the words….").  Other courts have submitted the per se issue to the jury for resolution.  *See* Eastern District of Texas case number 4:04-cv-00355-MHS, docket entry 140, filed 3/14/2005.

Contrary to Defendants' contention, by denying Albritton's motion for summary judgment on the per se issue, the Court did <u>not</u> find that the articles were not libelous per se.  The same

argument was rejected in *Texas Disposal*. *See* 219 S.W.3d at 581. ("By these rulings [denying summary judgment and directed verdict on per se issue], however, the trial court did not affirmatively rule that the statements were not defamatory per se. Rather, these rulings merely demonstrate that, prior to the conclusion of the trial, the court was not convinced as a matter of law that no ambiguities remained on the issue.") As in *Texas Disposal*, this Court simply declined to label the articles defamatory per se <u>as a matter of law for purposes for summary judgment</u> and, instead, determined that the jury must resolve the question. *Id.* Because the Court has made no ruling on the per se issue, it must submit the issue to the jury. *See id.* at 580.[6]

Defendants also attempt to read from the Court's Order an affirmative finding that extrinsic evidence and innuendo is required to interpret the posts, defeating Plaintiff's per se theory of liability. *See* D.E. 302 at 10. Applying defendants' flawed logic, a Court that refuses to decide the per se issue as a matter of law rules by default that there can be no defamation per se. Clearly, that is not the law. *See Texas Disposal*, 219 S.W.3d at 582.

Moreover, there is no need to resort to extrinsic evidence to interpret the allegations made in the Troll Tracker posts. In making a finding on the per se issue, the law permits the fact finder to consider the surrounding circumstances, the context of the statements, the setting in which they were made, and to take into consideration how a person of ordinary intelligence would perceive the entire statement without morphing the inquiry into one that depends on innuendo or extrinsic evidence. *See Fiber Sys.,* at 1163 n. 9; *Moore v. Waldrop*, 166 S.W.3d 380, 385-396 (Tex. App. Waco 2005). The jury's consideration of that wide breadth of information does not eliminate the accused statements from the per se category. *See Fiber Sys.*, 470 F.3d at 1163 ("considering the surrounding circumstances does not necessarily require the use of extrinsic evidence," as courts must consider the context in which the statement was made and the common meaning of the

---

[6] In *Texas Disposal,* the trial court was reversed for failing to query the jury as to whether the accused statements were defamatory per se, or to correctly instruct the jury on presumed damages stemming from a per se finding.

statement.”); *Moore*, 166 S.W. 3d at 385-386 (considering statements in light of the circumstances and context).

Only if the jury must resort to extrinsic evidence to prove a statement's defamatory meaning is a finding of per se defamation compromised. Extrinsic evidence includes the aid of inducements, colloquialisms and explanatory circumstances. *See Moore*, 166 S.W.3d at 385. Where, as here, innuendo is not needed to show that Defendants' statements are reasonably capable of a defamatory per se meaning, the jury is permitted to find defamation per se—even when that determination is made on more than the "face of the written words." *See Gateway Logistics Group, Inc. v. Dangerous Goods Mgmt. Australia*, Civ. No. H-05-2742, 2008 U.S. Dist. LEXIS 34246, at *34 (S.D. Tex. Apr. 25, 2008) (citing cases).

If Defendants insist on a ruling from the Court, the Court can easily resolve the issue in Albritton's favor. When the actionable statements injure the plaintiff in his office, profession or occupation, *Knox v. Taylor,* 992 S.W. 2d 40, 50 (Tex. App.—Houston [14th Dist.] 1999, no pet.), or the commission of a crime, *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 374 (Tex. 1984), they are defamatory per se. *See e.g., Texas Disposal*, 219 S.W.3d at 581. The libelous statements made about Albritton accuse him of conspiring to alter governmental records—a crime—of being an unethical lawyer, and of engaging in dishonest acts to benefit his client to Cisco's detriment. *See* Plaintiff's Exhs. 357 & 335. Those allegations are reinforced with specific words, including accusations of altering government records, "proof," "subpoenas" and "witnesses," aimed at reinforcing the criminal accusations made. *See id.* The accusations made in the posts are criminal offenses. *See* Plaintiff's Exh. 149, 214 251, 226. The accusations are tied to specific factually allegations and claims of wrongdoing that have been verified by the Troll Tracker.[7] *See Gateway Logistics Group,* 2008 U.S. Dist. LEXIS 34246, at *16-17. Defendants' statements can be reasonably understood to accuse Albritton of criminal conduct

---

[7] Defendants cite *Moore v. Waldrop*, 166 S.W.3d 380, 386 (Tex. App.—Waco, 2005). In *Moore*, the statement that plaintiff was a "crook" was made without any context of statement of facts. That is not the case here where Defendants' accusations were made alongside false and allegedly verified facts. *See Fiber Sys.,* 470 F.3d at 1162 (distinguishing *Moore*).

and conduct that injures him in his profession. Here, a per se finding is nearly compelled because the Troll Tracker's readers actually understood him to accuse Plaintiff of criminal conduct. *See* Plaintiff's Exhs. 355 and 226.

The false statements that Albritton had "conspired" with the clerk of the court to falsify official documents is so outrageous and undeniably harmful that Texas law presumes that Albritton has suffered injury, making the statements per se defamatory. *See Fiber Sys*., 470 F.3d at 1163 (allegation of thievery); *Gateway*, 2008 U.S. Dist. LEXIS 34246, *23 (lying and potentially subjecting client to legal penalties); *Mustang Athletic Corp.*, 137 S.W.3d at 339-340; *DeWald v. Home Depot*, No. 05-98-00013-CV, 2000 Tex. App. LEXIS 5757, at *12 (Tex. App.—Dallas Aug. 25, 2000 (insinuation of stealing). The case law cited by Plaintiff throughout this case demonstrates that a per se finding in this case is warranted. *See* D.E. 74 at 4-5; D.E. 78 at 1-5; D.E. 115 at 19-23; D.E. 130 at 10-15; D.E. 184 at 5-7.

There is no merit to Defendants' JMOL number 3 and it should be denied. If the Court is inclined, however, to resolve the issue as a matter of law, it should be resolved in Plaintiff's favor.

4. Response to JMOL #4: Defendants Attempt To Prevent The Jury From Determining The Amount Of Plaintiff's Emotional Distress Damages Is Meritless

Defendants' JMOL number 4 asks for judgment as a matter of law claiming that there is no evidence that Plaintiff has sustained mental anguish damages.[8] *See* D.E. 302 at 11-13. Defendant's motion is more like a closing argument than a JMOL in that it argues the facts that Defendants contend support their theory of the case while ignoring the dispute facts.. There is ample record evidence from which the jury could determine that Plaintiff has suffered mental

---

[8] Defendants characterize Plaintiff's mental anguish damages as being the only damages he seeks. Plaintiff notes for clarification that Plaintiff pleaded defamation per se and sought to recover damages for harm to his reputation and mental anguish. The Court excluded Plaintiff's right to recover presumed reputational damages. While Plaintiff accepts the Court's ruling, he continues to assert that reputational damages should be submitted to the jury as a matter of law because the defamation at issue is per se. Thus it is more accurate to say that mental anguish damages are the only compensatory damages before the jury.

anguish. Defendants' motion cannot prevent the jury from fulfilling its role as the arbiter of the disputed facts.

If the jury finds that Defendants' statements are defamatory per se, Plaintiff is entitled to recover some amount of mental anguish damages as a matter of law. The issue for the jury is not whether there is evidence of mental anguish—because no independent evidence is necessary— but rather, only the amount of damages to which Plaintiff is entitled.

Defendants contend that Albritton must prove Constitutional "actual malice" to recover presumed mental anguish damages. *See* D.E. 302 at 14, n. 10. Defendants' argument rests on a passage in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349-350 (1974), stating that states may not permit recovery of presumed or punitive damages absent a showing of actual malice. The *Gertz* Court goes on to hold that it is necessary to restrict defamation plaintiffs to recovery of damages for actual injury. *See id.* Defendants read the passage in *Gertz* to require a showing of actual malice before mental anguish damages can even be submitted to the jury.

The Texas Supreme Court reads the same passage differently. In *Bascom v. Bentley*, 94 S.W.3d 561, 605 (Tex. 2002), the Court considered *Gertz* and held that Texas law "presumes that statements that are defamatory per se injure the victim's reputation and entitle him to recover general damages, including damages for loss of reputation and mental anguish." *See id.* at 604. The *Bentley* Court understood *Gertz* not to apply a bar to consideration of presumed damages by the jury, but rather to bar excessive presumed damages that may be awarded by the jury. *See id.* at 605. Thus, if the jury determines that Defendants' statements are per se defamatory, Albritton is entitled to damages for mental anguish, although those damages will be subject to post-trial scrutiny to ensure that the jury's award is limited to an amount that compensates him for his actual damages. *See id.*

Even if Plaintiff's damages are not presumed, he may recover mental anguish damages if he wins his defamation claim.

A mental anguish damages award requires direct evidence of the nature, duration, or severity of the anguish, thus establishing a substantial disruption in the plaintiff's daily routine, or other

evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444, 38 Tex. Sup. Ct. J. 828 (Tex. 1995). Evidence of mental anguish need not be corroborated by doctors, psychologists, or other witnesses, but the plaintiff must support her claims with competent evidence regarding the "nature, extent, and duration" of the harm. *Smith v. Lowe's Home Ctrs., Inc.,* 2005 U.S. Dist. LEXIS 12812 (W.D. Tex. June 29, 2005) (internal citation omitted). Mental anguish damages can be supported by Plaintiff's testimony alone. *See Williams v. Trader Publ'g Co.,* 218 F.3d 481, 486 (5th Cir. 2000) (holding that plaintiff's testimony alone was sufficient to support the jury's award for mental anguish damages); *Migis v. Pearle Vision, Inc.,* 135 F.3d 1041, 1047 (same).

There is sufficient record evidence of Plaintiff's mental anguish to permit the jury to resolve the issue.

Plaintiff offered direct testimony about the mental anguish he has experienced as a result of the defamatory Troll Tracker posts. Plaintiff testified that he is humiliated by the articles and that he feels like he world thinks he is not honorable. *See* 09/17/09 Trial Tr. at 54:7-25. He testified that he is worried about the accusations and that he has had sleepless nights. *See id.* Defendants' accusations have impacted Plaintiff's work and it has been difficult for him to work on the *ESN v. Cisco* case. *See id.;* 94:3-9.

Plaintiff also testified that he knows many people have read the blog and understood the accusations about him to be criminal. *See id.* at 41:23-25; 42:11-12. He testified that he wonders when he goes into a court room which of the people in the room believes he is the guy who conspired with the court clerk to alter government records. *See id.* at 39:8-40:11. In fact, he was told by another lawyer that his clients asked if Plaintiff was the guy who had conspired with the Court clerk to manufacture documents. *See id.* at 42:13-15; 43:16-20. Mr. Albritton understood that the person who asked that question didn't want to have any involvement with Plaintiff based on the accusations made in Defendants' posts. *See id.* at 43:16-20. Plaintiff testified about how upset he was about the fact people are out there saying that he is a bad guy

who does wrong things. *See id.* at 43:16-24. Plaintiff has had friends who have been on conference calls wherein the blog becomes the topic of discussion and people on the call talk about what he was alleged to have done and how bold and bad his conduct was. *See id.* at 44:7-9. Plaintiff also testified that he thinks about the posts almost every day and that it has had some impact on his leisure time. *See id.* at 63:25-64:2. These facts are sufficient to submit the issue to the jury.

Although Plaintiff's testimony alone is sufficient to present the damages issue to the jury, there trial record also contains additional evidence of Plaintiff's mental anguish. Plaintiff's wife, Michelle Albritton, testified that he was "devastated by the accusations, frustrated, angry, and worried about how it would impact his reputation." *See* 09/17/09 Trial Tr. at 207:19-208:5. She testified that Plaintiff was worried and concerned that people who did not know him would believe the false accusations and that it would impact his reputation. *Id.* at 208:18-209:1; 210:2-14. Mr. Albritton has expressed these concerns to his wife a lot over a long period of time. *Id.* at 209:2-5, 17-21. She also testified that Plaintiff's devastation, frustration, anger and worry have not dissipated over time. *Id.* at 214:12-16.

John Ward Jr. testified that he and the Plaintiff discussed loosing sleep and the fact that clients and other lawyers were commenting on the blog. *See* 09/17/09 Trial Tr. 769:9-16. Mr. Ward testified that Plaintiff was upset, angry and distracted by worry. *Id.* at 769:17-18. Mr. Ward offered the jury compelling testimony that the accused blogs were humiliating for both he and Albritton. *Id.* at 769:24-770:9. Plaintiff knew people were talking about the articles because both he and Mr. Ward would get calls from clients and other people talking about the articles. *Id.* at 770:10-16; 807:20-808:10.

Mr. McAndrews testified that Plaintiff was angered and frustrated to the point that has impacted his ability to focus on his work on the *ESN v. Cisco* case. *See* 09/14/09 Trial Tr. at 185:7-17.

Amie Mathis testified that Plaintiff had difficulty focusing on work and taking care of business. *See* 09/15/09 Trial Tr. at 285:17-20. Ms. Mathis testified that the Troll Tracker posts

became Plaintiff's main concern and the main topic on his mind, not other work he had going on at the time. *Id*. at 286:2-5. She testified he was upset and outraged by Defendants' false accusations. *Id.* at 284:19-20; 285:4-6. She also testified that Plaintiff was very disturbed by the accusations because he was concerned about the reputation of his law firm. *Id.* at. 285:17-19.

There is sufficient evidence that the publication of the libelous post cost Albritton time, deprived him of sleep, caused him embarrassment in the patent community and in the local community, impacted his leisure time, interfered with work, caused him to habitually worry that his honor and integrity had been impugned, and caused him to worry about the harm to his reputation to submit his mental anguish damages to the jury. *See Bentley*, 94 S.W.3d 561, 606-07. There is no basis upon which to prevent the jury from deciding the factual issues concerning Plaintiff's mental anguish. *See Smith*, 2005 U.S. Dist. LEXIS 12812, at * 16. The jury is charged with evaluating the record evidence and making a determination regarding the existence of Plaintiff's damages and the amount to be awarded for those damages. A determination of whether Plaintiff has suffered mental anguish, and the amount he should be compensated for those damages are quintessential jury issues.

    5. **Response to JMOL #5: The Standard Of Fault Is Negligence And There Is Sufficient Evidence That Defendants Were Negligent In Defaming Plaintiff**

Defendants' JMOL Number 5 argues that there is insufficient evidence of Defendants' negligence to submit the issue to the jury. *See* D.E. 302 at 13-14.

The Court asked Plaintiff to address the issue of whether a private figure caught up in a public controversy affects the burden of proof in a cause of action for defamation. If the Court determines that the articles discuss a matter of public concern, it will not change the negligence standard of fault that Court has found applies in this case. If the Court finds that the articles at issue do not address a matter of public concern, then the standard of fault will likely be determined by common law. *See Snead v. Redland Aggregates Ltd.,* 98 F.2d 1325, 1332-33 (5th Cir. 1993).

The negligence standard of fault is not affected by resolution of the public/private concern issue because the standard of fault depends on whether Plaintiff is a private figure or a public figure. *See Gertz,* 418 U.S. at 347 (rejecting the Court's prior holding in *Rosenbloom v. Metromedia, Inc.,* which required the application of the *New York Times* "actual malice" standard to any publication about an issue of significant public interest without regard to the status of the Plaintiff, and holding instead that if the Plaintiff is a private figure, the states may define for themselves the applicable standard of liability). The Court has ruled that Plaintiff is a private figure. *See* D.E. 217 at 11. Under Texas law, a private figure need only prove negligence.[9] *Brown v. Petrolite Corp.*, 965 F.2d 38, 44-45 (5th Cir. 1992).

Defendants argue that the Constitutional actual malice standard should apply (presumably seeking reconsideration of the Court's Order to the contrary) and that there can be no actual malice in this case because Mr. Frenkel believed the statements were true when made. *See* D.E. 302 at 14. The Court need not address this argument because it has already found that Plaintiff is a private figure. *See* D.E. 217 at 11. However, if the Court were inclined to consider Defendants' argument, it is meritless. Defendants cannot automatically insure a favorable verdict by arguing that Frenkel acted in good faith. *See Brown*, 965 F.2d at 47. "[T]he subjective determination of whether a defendant in fact entertained serious doubts as to the truth of the statements may be proved by inference, as it would be rare for a defendant to admit to such doubts." *Id.* (internal citation omitted). The jury can infer malice from objective circumstantial evidence, which can override Frenkel's protestations of good faith. *See id.; Texas Disposal*, 219 S.W.3d at 577 (jury is entitled to reject Defendant's self-serving assertion that he did not believe his statements were false and did not entertain serious doubts about the truth).

_____

[9] In *Foster v. Laredo Newspapers*, 541 S.W.2d 809, 819 (Tex. 1976), The Texas Supreme Court clarified Texas' standard of fault in cases involving private figures and issues of public concern. The Court noted that since *Gertz* was decided, two states had extended the *New York Times* standard to cover private individuals involved in matters of public concern. *See id.* at 819. The Court rejected that approach, followed the majority of courts applying a negligence standard, and held that a negligence standard of fault applies to private figures whether or not the speech involves a matter of public or private concern. *See id.* at 819-820.

To prove negligence, Plaintiff must show that Defendants knew or should have known, in the exercise of ordinary care, that the impression created by the article was false and had the potential to be defamatory. *See* Texas Pattern Jury Instruction 110.10. There is sufficient record evidence of Defendants' negligence in posting the accusations about Plaintiff to submit the negligence question to the jury.

The evidence introduced at trial is more than sufficient to submit negligence to the jury. Defendants have been litigants in the Eastern District of Texas before, and that at least Frenkel read and understood the local rules, which provide that the date and time stated on the Notice of Electronic filing is the official record of filing. *See* Plaintiff's Exh. 233. Persons working for Cisco knew and understood that the Notice of Electronic Filing was the official record of when a document is filed. 9/15/09 Trial Tr. at 460:4-19. Defendants did not review the official filing receipt before publishing their false accusations that the "filing date stamp" on the complaint. *See* Plaintiff's Exh. 357; 9/15/09 Trial Tr. at 460:20-461:1. Defendants did not ask the court clerk for a copy of the Notice of Electronic filing. *See* 9/15/09 Trial Tr. at 460:24-461:1. Nor did they call Mr. Albritton's office to request a copy of the filing receipt or to inquire about the facts before making their false accusations.

Although there was a document entitled "How to Electronically File A New Case" available on the Court's website, Defendants did not consult that document to determine the Court's procedures for filing complaints using the ECF system. *See* Plaintiff's Exh. 433.

Defendants rushed to publish the accusations about Mr. Albritton without ascertaining first whether the facts were true. Ms. Yen suggested that Cisco create a news story, although she acknowledged that she did not yet have all the facts. *See* Plaintiff's Exh. 286. Ms. Yen's email was sent to Cisco's employees in governmental affairs and public relations indicating that she wanted to widely disseminate the story, and do so as rapidly as possible. *See id.* Cisco turned to the anonymous Troll Tracker to publish public statements either before the facts were known or after they were known but ignored. The jury can conclude from the facts presented that

Defendants were negligent in making false accusations of criminal conduct before the facts were fully investigated.

Defendants knew that Baker Botts was getting in contact with the clerk's office to obtain the facts. Plaintiff's Exh. 456. Baker Botts learned that ESN had logged on to the system before midnight but had filed after midnight. 09/15/09 Trial Tr. at 465:11-466:24. Baker Botts also learned that the docket entry was corrected to show the correct filing date. 09/15/09 Trial Tr. at 466:22-468:22. Baker Botts reported that information back to Cisco and Frenkel. 09/15/09 Trial Tr. at 472:6-25; 502:2-12:506:11-22. The jury can reasonably find that Mr. Frenkel had that information at his disposal when he posted the October 18th post because that post references ESN's call to the court clerk in that post, the fact of which was learned by Baker Botts' paralegal Jillian Powell. *See* Plaintiff's Exh. 357; 09/15/09 Trial Tr. at 465:475:23-476:21.

Thus, the jury has sufficient evidence from which to conclude that by the time Defendants' published the October 18th post they knew or should have known and that the filing date had resulted from an error in the clerk's office and there was not conspiracy to alter government records.

With respect to the revised October 18th article, Plaintiff submits that Defendants' liability is clear. By the time that the October 18th post was revised and republished by Defendants, they clearly knew that there had been a mistake with the court's filing system and that Mr. Albritton did not conspire to alter government documents. Defendants had had several conversations with Baker Botts by the time the revised post was published. Moreover, by the time the October 18th post was revised on October 19th, ESN had filed a Motion to Enjoin Parallel Litigation in the ESN v. Cisco case. Cisco received a copy of ESN's motion on October 18th, wherein ESN detailed the problem with the Court's electronic filing system and provided a copy of the Notice of Electronic Filing. Plaintiff's Exh. 47. Nonetheless, although Defendants edited the post on October 19th to remove the accusations he made about the clerk's office, they left the false and defamatory statements about Plaintiff intact until the Troll Tracker's identity was discovered and this case was filed.

Defendants' republished the October 18th post on October 19th, making changes based on facts learned, though not changes which would have tended to make them less defamatory of Mr. Albritton. Defendants were provided with many indications that the articles may not have fairly and truthfully reflected Mr. Albritton's conduct. In publishing the articles in the form it did, Defendants knew or should have known that it was subjecting itself to potential liability. *See Levine v. CMP Publications*, 738 F.2d 660, 673-674 (5th Cir. Tex. 1984). At the time the Defendants published the revised post on October 19th, they unquestionably knew that there had been an error with the court's software. Defendants' failure to include the innocent explanation for the changed docket entry in the ESN case demonstrates actual malice, and meets the standard for negligence.

The jury can infer from the evidence that Defendants failed to exercise reasonable care in making the public accusations about Mr. Albritton because they never thought they statements would be traced back to Cisco. The jury can also conclude from the fact that the statements were made by and at the request of Cisco's lawyers that Defendants knew the defamatory potential of the statements.

There is sufficient evidence from which the jury can find, at a minimum, Defendants negligently defamed Mr. Albritton. Thus, Defendants' JMOL number 5 should be denied.

6. Response to JMOL #6: There Is Sufficient Evidence To Submit Plaintiff's Defamatory Impression Theory Should To The Jury

Defendants' JMOL Number 6 asks the Court to preclude the jury from considering Plaintiff's defamatory impression theory of liability because there is no evidence that Defendants juxtaposed facts in a misleading way, or omitted material facts in a misleading way. *See* D.E. 302 at 14.

Defamation via a false and defamatory impression is not a "novel" theory of libel as Defendants suggest. *See* D.E. 302 at 14. It is a well-established theory of recovery under Texas law. *See Turner,* 38 S.W.3d at 113-14; *Golden Bear*, 708 F.2d at 949 (A statement is not true or even substantially true if, by implication, an entirely untrue impression is made by omission of

part of the facts); *Braun v. Flynt*, 726 F.2d 245, 253 (5th Cir. Tex. 1984) (article actionable where it was capable of conveying a false impression). *See also* Texas Pattern Jury Instructions 110.9-110.11.

In *Turner*, the court held that "a plaintiff can bring a claim for defamation when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way." Id. The *Turner* broadcast questioned a mayoral candidate's involvement in his former client's multi-million-dollar insurance scam. *Id.* at 111. While Turner's role was limited to drafting and probating the client's will, the report gave the false impression that he was involved in a conspiracy to fake his client's death. *Id.* at 117-19. The Texas Supreme Court concluded that the broadcast as a whole was substantially false and defamatory, because it "cast more suspicion on Turner's action than an accurate account would have warranted." *Id.* at 119. The case cited by Defendants is does not hold that the theory of liability set forth in *Turner* is novel, it merely found the statements in that case did not create a false and defamatory impression because the broadcast as a whole did not misrepresent the story. *See Green v. CBS Inc.,* 286 F.3d 281, 285 (5th Cir. Tex. 2002).

Here, Defendants' published statements omitted known material facts that would have shown that the change in the docket entry was to correct a mistake with the Court's ECF system and that Plaintiff did not conspire to alter governmental records. Defendants' omission of the key fact that there had been an error, or at a minimum that ESN's counsel claimed there had been an error, cast more suspicion on Plaintiff than was warranted. Plaintiff's theory of defamation by false impression should be submitted to the jury. *See Golden Bear, Inc*., 708 F.2d at 949 (Where an ordinary reader can infer from a published statement that the Plaintiff engaged in legal actions, the issue should be resolved by the jury).

      7.   Response to JMOL Number 7:   Whether Or Not The Articles At Issue Involve A Matter of Public Concern Defendants Bear The Burden Of Proving Falsity

Whether speech addresses a matter of public concern must be determined by the

content, form and context of the statement as revealed by the whole record. *See Snead v. Redland Aggregates Ltd.*, 998 F.2d 1325, 1330 (5th Cir. 1993). The record as a whole demonstrates that the speech at issue in this case does not deal with an issue of public concern but rather a dispute between private litigants, one of which happened to have access to a web blog upon which to attack opposing counsel. The accused posts do not discuss the need for local rules requiring a motion before a docket entry is corrected, although a later post not at issue in this case does. They do not discuss the need for better oversight at the clerk's office. Instead, they launch a covert attack on the reputation of Cisco's opposing counsel. Cisco's attacks are not matter of "public concern" simply because they have some nexus to court proceedings." *See Snead,* 998 F.2d at 1330; *Super Future Equities, Inc. v. Wells Fargo Bank Minnesota, N.A*., 553 F. Supp. 2d 680, 690 (N. D. Tex. 2008); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc*., 472 U.S. 749, 761 (1985); *Time Inc. v. Firestone*, 424 U.S. 448, 455-456 ((1976); *Mullen v. Solber*, 952 N.E. 2d 950, 952 (Ill. App. 1998).

Defendants seek a ruling that the articles discuss a matter of public concern in order to shift the burden of proving falsity onto Plaintiff. In a defamation case brought by a private figure plaintiff, the burden of proving falsity rests with defendant. *See Super Future Equities*, 553 F. Supp. 2d at 691-91 ("Truth is an affirmative defense in a defamation case brought by a private plaintiff, and the defendant bears the burden of proving the alleged defamatory statements were true). During summary judgment, the Court allocated the burden of proving falsity to Defendants. *See* D.E. 217 at 8.

Defendants now argue that *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986) requires Plaintiff to prove falsity if the Court finds the accused articles concern a matter of public concern. In *Philadelphia News*, the Supreme Court held that the plaintiff bears the burden of proving that allegedly defamatory statements are false when the publication involves a matter of public concern *and the action is against a media defendant*. The *Philadelphia Newspapers* Court expressly limited its holding to media

24

defendants and refused to consider what standards would apply in an action against a nonmedia defendant. *Id*. at 1565 n.4. *See Bentley v. Bunton*, 94 S.W.3d 561, 586 (Tex. 2002).

Defendants are not "media defendants." Defendant Cisco is not a media company; it is a technology company. At the time Defendant Frenkel wrote the accused articles he was acting as Cisco's lawyer. Cisco has admitted that Frenkel was acting in the course and scope of his employment *at Cisco* at the time he wrote the accused articles. Frenkel's written work, done at Cisco's behest and paid for by Cisco, does not entitle him or Cisco to lay claim to protections afforded "media defendants." Thus, however the Court decides the public concern issue, Defendants should bear the burden of proving falsity.

8. Response to JMOL numbers 8 & 9: There Is Sufficient Evidence To Submit Punitive Damages To The Jury

Defendants' last two JMOL motions, numbers 8 & 9, seek to prevent the jury from considering the issue of punitive damages.

Defendants' JMOL number 8 argues that Plaintiff has not presented sufficient evidence from which the jury can award punitive damages under Tex. Civ. Prac. & Rem. Code §§ 41.001(7); 41.003(a). Chapter 41 malice means specific intent to cause Plaintiff substantial injury or harm. *See* Tex. Civ. Prac. Rem. Code Ann. § 41.001(7).

Defendants' JMOL number 9 argues that Plaintiff had not presented sufficient evidence from which the jury can award punitive damages under the Constitutional malice standard. Malice under the *New York Times* Standard means publication of a statement with knowledge of falsity or reckless disregard of truth or falsity. *See Brown,* 965 F.2d at 46-47, citing New *York Times Co. v. Sullivan,* 376 U.S. 254, 279-80 (1964). "The [Supreme] Court has cautioned, however, that reckless disregard 'cannot be fully encompassed in one infallible definition. Inevitably its outer limits will be marked out through case-by-case adjudication...." *Id.* (internal citation omitted). Facts demonstrating the speaker's motive, intent, negligence, intentional ignorance of

or disregard of contradictory evidence, failure to verify facts, overstating the facts, the cumulative nature of the evidence, along with appropriate inferences drawn from the evidence, all provide evidence of actual malice. *Harte-Hanks Commc'ns, Inc. v. Connaughton,* 491 U.S. 657, 668 (1989); *Fiber Sys.,* 470 F.3d at 1170; *Brown,* 965 F.2d at 47; *Bentley,* 94 S.W.3d at 590.

Although Plaintiff disagrees that both standards are required, there is sufficient record evidence supporting both.

Cisco's lack of malice argument relies heavily on self-serving testimony from Frenkel that should be given little weight. *See Brown,* 965 F.2d at 47 (defendants cannot automatically insure a favorable verdict by alleging good faith). Resolution of the malice issue is most appropriately left to the jury to determine in light of the totality of the evidence and after examining the demeanor of the witnesses. *See id.* (jury may infer actual malice from objective circumstantial evidence, which can override a defendant's protestations of good faith.). The evidence introduced at trial is sufficient to have the jury resolve the malice issue. That evidence shows:

- In 2005, Frenkel filed an Application to Appear Pro Hac Vice in the Eastern District of Texas wherein he swore or affirmed that he had read and will comply with the Local Rules. *See* Plaintiff's Exh. 233. If he understood the rules, then his accusations must have been intentional.

- In early 2007, ESN and Cisco had been discussing Cisco's willful infringement of ESN's soon to be issued patent." Cisco was aware that the Patent and Trademark Office found ESN's soon to be issued patent novel as compared to the claims of a patent application filed by Cisco. ESN informed Cisco that it would need a license to ESN's newly issued patent, but the parties' discussion had reached an impasse..

- On October 15th at 5:00 pm Central Daylight Time," Frenkel sent an email to Cisco's in-house lawyers, including his direct supervisor, Mallun Yen, telling them that ESN had filed suit. Frenkel said ESN's patent would not issue until the next day, implying that the Texas Court did not have subject matter jurisdiction. Frenkel suggested "[l]et's file a DJ in a jurisdiction where you can efile, on the east coast, at 12:01 am. *See* Plaintiff's Exhibit 395.

- Right after the complaint had been filed in the early hours of October 16th, Frenkel forwarded the ESN Complaint to his Cisco team, and to counsel at Baker Botts in Dallas. Frenkel stated that not only did the ESN Complaint make a claim for subject matter

jurisdiction, but there was also a claim for violation of provisional rights under 35 USC 154(d) for damages accruing before the patent issued. Frenkel lamented that "I think they still don't have subject matter [jurisdiction] . . . "but I can see arguments to the contrary. This won't be such a slam dunk." *See* Plaintiff's Exh. 287.

- Cisco filed a DJ action in Connecticut at 10:32 am. *See* Plaintiff's Exh. 20 at EMA 0250.

- At 6:00 p.m. Frenkel logged on to his Troll Tracker blog and sometime thereafter began posting an anonymous comment entitled "Troll Jumps the Gun, Sues Cisco Too Early.'In his post, Frenkel took great pains to hide the fact that his information was coming from his work at Cisco, claiming the source of his information was another blogger, stating "Cisco appeared to pick up on this, very quickly." Frenkel then stated that ESN had filed an Amended Complaint changing nothing other than the filing date. Frenkel concluded: "Survey says? XXXXXX (insert "Family Feud" sound here). Sorry, ESN. You're on your way to New Haven.

On the morning of October 18, 2007, the following events occurred before Frenkel

publically accused Albritton of conspiring with the court clerk to alter the record to fraudulently

manufacture subject matter jurisdiction where none existed:

- Frenkel sent an email to Schowalter and Kurt Pankratz at Baker Botts, and to members of the Cisco team including Yen, advising them "The court clerk of the Eastern District of Texas changed the docket and all of the documents to reflect a 10/16 filing date instead of a 10/15 filing date in the ESN case." Frenkel asks Pankratz "Kurt, what options do we have?" *See* Plaintiff's Exh. 304.

- Pankratz responded to Frenkel saying that he had a paralegal in his office getting the complaint with the revised banner and getting in touch with the clerk to find out what happened. *See* Plaintiff's Exh. 304.

- Sometime in the morning of October 18, 2007 Baker and Botts's paralegal, Jillian Powell, called the court clerk, who she has called many times before. 09/15/09 Trial Tr. at 462:2-15. She reported back to Kurt Pankratz at Baker Botts that she had talked to the court clerk in the Texarkana office where the ESN Complaint had been filed. 09/15/09 Trial Tr. at 475:24-476:3. Powell explained that Albritton's office had logged on to the system on October but did not actually file the complaint until October l6th. 09/15/09 Trial Tr. at 465:15-22. She also learned that Albritton's office explained to the court that the complaint was filed after midnight, and from there the clerk corrected the date. 09/15/09 Trial Tr. at 465:15-22.

- Kurt Pankratz reported to Cisco the information that Jillian Powell had learned from the court clerk to Cisco. 09/15/09 Trial Tr. at 503:21-504:12.

- Yen forwarded an email to Mark Chandler, Cisco's General Counsel; John Noh, Cisco' s Director of Public Relations; Matt Tanielian, Cisco's Senior Technology Policy Counsel;

and Neal Rubin, Cisco's Corporate Counsel, saying "This is ridiculous. The 'buzz' we are getting is that the local counsel persuaded the court clerk to change the filing date to Oct. l6th. We DJd them in Connecticut, and then yesterday, they arranged for the filing date to be changed to Oct. 16th the day the patent issued. . . . Maybe a news story here? Though we'll obviously keep getting data to track down what happened." *See* Plaintiff's Exh. 304.

- Approximately fifteen minutes later, John Noh responded to Yen's email and copied Frenkel. He asked, "In the simplest terms possible, are you saying that this troll filed a patent lawsuit against us before they even had the patent issued to them? Can we have the TrollTracker do a very simply worded blog about this? I'd love to be able to send it out to a few of the legal reporters and bloggers. I play a game with them now about I have no idea who the TrollTracker is but I read his/her blog religiously." Then, he asks Frenkel, "TT Would this be hitting too close in terms of dotted line between TT and Cisco? *See* Plaintiff's Exh. 304.

- Almost immediately, at 12:06 p.m., Yen indicated her agreement with the plan but adds that Frenkel should attribute his story to an anonymous tip. *See* Plaintiff's Exh. 304.

- Understanding the marching orders he received from Yen and Noh, Frenkel responded with an email that said "Stay tuned." Plaintiff's Exh. 286. Thereafter Frenkel began writing his October 18 post accusing Albritton of conspiring with the court clerk to alter the complaint so as to create subject matter jurisdiction in the *ESN* case.

- Frenkel emailed Noh and Yen a link to his post. Plaintiff's Exh. 534.

- Within minutes, at 12:25 p.m., Noh responded to Frenkel and Yen saying "Brilliant. Thank you." Plaintiff's Exh. 534.

- Yen forwarded the post Matt Tanielian a member of Cisco's Governmental Affairs Group in Washington D.C. *See* Plaintiff's Exh. 273.

These documents show that Frenkel, at the direction of and with knowledge of senior management at Cisco, knew before he posted his libelous statements that they were false and/or created a defamatory impression. Baker Botts told Frenkel and Cisco that he had Powell determining what had occurred with the ESN filing. Pankratz then told Cisco what Powell had learned from the court clerk; that the docket was corrected as a result of a mistake with the court's filing system. Consequently, Frenkel knew at the time he posted his October 18th post that: (1) As the clerk explained to Powell, the ESN Complaint had been filed on Oct. 16th (2) Albritton's office had followed the same practice employed by Baker Botts and called the court

clerk for help, (3) that the court clerk "corrected" the docket based on the actual time of filing, (4) that docket entries are often wrong and are unreliable as a source of accurate information, Plaintiff's Exh. 362 (5) even if the Complaint had been filed a day early as Cisco now claims, ESN may have had jurisdiction in any event in the Eastern District of Texas, and (6) there was no conspiracy to alter the official record or any unethical conduct on Albritton's part. Cisco's knowledge of these facts explains why it ultimately agreed to fix venue in the Eastern District of Texas. Plaintiff's Exhs. 1, 26, 27.

Additional information immediately following the October 18, 2007 libelous posting also confirm Defendants acted with malice by posting the another libelous statements on October 19th.

- On October 18th ESN filed a Motion to Enjoin Parallel Proceedings that laid out in detail the events surrounding the filing of the ESN Complaint and explaining that the Notice of Electronic Filing controlled. Plaintiff's Exh. 20. Cisco never responded. .

- On October 19, 2007, Frenkel received an email from Michael Smith who explained the local rule for obtaining Civil Cover sheet 24 hours in advance of filing a complaint, that the Civil Cover sheet information is available online before a complaint is filed, and how the filing date of the complaint could be misunderstood under this procedure. Smith told Frenkel that "the court records peg [the filing] time to the millisecond, so there's no doubt about that. If the complaint was e-filed, that's the time that will control under FRCP 3." Smith continued "what I'm saying is that all the stamping and dating on the materials that were delivered to the clerk's office to set up the case won't matter if they were not the 'filing' of the complaint, but merely setting up the file for an online filing the next day, per the local requirements for electronic filing. See Plaintiff's Exh. 327a.

After receiving this information clearly demonstrating that the allegations in the October 18 post were false, Frenkel amended the post to remove the "Banana Republic of East Texas" comment, but not to delete the allegations that Albritton engaged in criminal and unethical conduct in the ESN case.

Within hours of writing his October 18th defamatory post, Frenkel received additional confirmation what he already knew; the filing date on the docket was wrong, was corrected, and there was not conspiracy to alter governmental records. Based on that information he should

have withdrawn and retracted his comments. He didn't. Those post were publically available until March 2008, until after Cisco was sued for defamation by Plaintiff.

- On Novemeber 7, 2007, Frenkel acknowledged that some his readers understood him to accuse ESN's lawyers of a crime when he used the word "altered." Despite knowing that readers of his blog understood his accusations as claims of criminal conduct, Frenkel let the posts available on the Troll Tracker blog until March of 2008. That too is evidence of malice and specific intent to harm. *See* Plaintiff's Exh. 355.

Defendants' gross negligence, intent to harm, malice and reckless disregard for the truth is demonstrated by their failure to retract is accusations against Albritton when Frenkel amended his post on October 19, 2007. Frenkel's October 18th post was changed to delete his reference to the "Banana Republic of East Texas." By this time Frenkel also unquestionably knew that: (1) the error in the docket entry was the result of a glitch in the court's computer software, (2) that Albritton had actually filed the complaint on Oct. 16; (3) there was no conspiracy, illegal conduct, or unethical conduct on the part of Albritton. Despite having this information, Frenkel did not correct or withdraw his comments about Albritton when he amended his post to withdraw his accusatory statements about the Eastern District of Texas. Nor did Frenkel bother to include information known to him that would have mitigated the accusations he made about Albritton's conduct. Instead, he continued to post criminal accusations, accusations of unethical conduct, and to paint a defamatory impression that Albritton had engaged in criminal and unethical conduct in the ESN case. Frenkel's continued publication shows he defamed Albritton with actual malice.

- On February 25, 2008, Yen emailed her boss Mark Chandler, Cisco's General Counsel, and Neal Rubin, Cisco's Corporate Counsel, in an attempt to re-write history to conceal Cisco' s involvement. Yen writes "Mark, Neal, Went back to check my emails. FYI regarding ESN and the blog. I recall that Rick's response after getting my message [suggesting a news story attributed to an anonymous source] was that he had already written it." Chandler immediately tries to distance himself by saying "well I wasn't even on this thread." Yen and Chandler's transparent attempt to create a record for litigation were foiled by Frenkel, who reported back that his blogger records showed he posted only after receiving Yen's email. He recalled that she had suggested the post. *See* Plaintiff's Exh. 299.

- Shortly after Frenkel was unmasked, Cisco, speaking through Noh, claimed that it had nothing to do with Frenkel's defamatory posts. *See* Plaintiff's Exh. 474.

- Today, even with the testimony provided by David Maland and other members of the clerk's office and the evidence of record demonstrating that Albritton did nothing wrong, Cisco maintains Frenkel's false accusations of criminal and unethical conduct are true. D.E. 302. Cisco's ongoing course of deceit and continued untruths is also evidence of actual malice. *See Bentley,* 94 S.W.3d at 600-02; *Tex. Disposal Sys.,* 219 S.W.3d at 578.

- Cisco continues to say false things about Albritton. *See* Plaintiff's Exh. 213.

The jury is entitled to hear evidence of Cisco's ill motive and intent demonstrated in part by the unique steps taken by Cisco to defame Albritton. The jury is also entitled to consider Frenkel's lack of candor and intentional efforts to mislead his readers into believing he was not associated with the *ESN v. Cisco* case. The jury can take into account the zeal with which Cisco went about defaming Albritton.

The facts of record in this case are more than sufficient to overcome Cisco's professed lack of malice and to let the jury determine whether Cisco acted with actual malice when it defamed Albritton. *Harte-Hanks,* 491 U.S. at 668; *Fiber Sys.,* 470 F.3d at 1170; *Brown,* 965 F.2d at 47; *Bentley,* 94 S.W.3d at 590. Cumulatively, they are overwhelming evidence that Cisco acted with actual malice. Even if a jury is not persuaded that Cisco had actual knowledge of the falsity of its statements, the record facts are sufficient for the jury to conclude that Cisco acted with reckless disregard of the truth..

Respectfully submitted,

Nicholas H. Patton
State Bar No. 15631000
Patton, Tidwell & Schroeder, LLP
4605 Texas Boulevard
Texarkana, Texas 75503
903.792.7080 / 903.792.8233 (Fax)

Patricia L. Peden
LAW OFFICE OF PATRICIA L. PEDEN

610 16th Street, Suite 400
Oakland, California 94612
Telephone: 510.268.8033

James A. Holmes
Texas Bar No. 00784290
THE LAW OFFICE OF JAMES HOLMES, P.C.
635 South Main, Suite 203
Henderson, Texas 75654
903.657.2800 / 903.657.2855 (Fax)

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on this 20th day of September, 2009.

_____
Nicholas H. Patton